Martin FLEISHER, as trustee of the Michael Moss Irrevocable Life Insurance Trust II, and Jonathan Berck, as trustee of the John L. Loeb, Jr. Insurance Trust, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

PHOENIX LIFE INSURANCE COMPANY, Defendant.

No. 11 Civ. 8405(CM).

United States District Court, S.D. New York.

Feb. 7, 2014.

Frances Sarah Lewis, Steven Gerald Sklaver, Susman Godfrey LLP, Los Ange-les, CA, Jacob W. Buchdahl, Seth D. Ard, Shawn J. Rabin, Susman Godfrey LLP, Rebecca Sol Tinio, U.S. Attorney's Office, New York, NY, for Plaintiffs.

Brian Patrick Perryman, Jason H. Gould, Kristen Reilly, Waldemar J. Pflepsen, Carlton Fields Jorden Burt, P.A., Washington, DC, Jacob R. Hathorn, Robert David Helfand, Stephen J. Jorden, Carlton Fields Jorden Burt, P.A., Simsbury, CT, Patrick J. Feeley, Dorsey & Whitney LLP, New York, NY, Raul Antonio Cuervo, Carlton Fields Jorden Burt, P.A., Miami, FL, for Defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs Jonathan Berck ("Berck"), as Trustee of the John L. Loeb, Jr. Insurance Trust, and Martin Fleisher ("Fleisher," and, together with Berck, "Plaintiffs"), as Trustee of the Michael Moss Irrevocable Life Insurance Trust II, initiated this action against Defendant Phoenix Life Insurance Company ("Phoenix"). The only remaining claim (Count One) alleges that Phoenix breached the express terms of certain insurance policies owned by the Trusts.

Phoenix moves to dismiss Berck's claim for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and for partial summary judgment pursuant to Rule 56. For the reasons discussed below, both motions are denied.

### BACKGROUND

#### A. The PAUL Policies

Plaintiff Berck is the trustee of the John L. Loeb, Jr. Insurance Trust (the "Loeb

Trust"). Plaintiff Fleisher is the trustee of the Michael Moss Irrevocable Life Insurance Trust II (the "Moss Trust," and, together with the Loeb Trust, the "Trusts"). Plaintiffs purchased "premium-adjustable, universal life" ("PAUL") insurance policies from Phoenix.

The principal benefit of PAUL policies is their flexibility—"they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force." Compl. at ¶ 2. In contrast with standard whole life insurance policies, the PAUL policies do not require a policyholder to pay a fixed monthly premium. Rather, a policyholder need only pay a premium that is sufficient to cover certain expenses that Phoenix deducts from his account on a monthly basis. One of these monthly charges is the "cost of insurance" ("COI"). The COI charge represents Phoenix's risk—the cost of paying the death benefit (the policy's "face value") to the policy's beneficiary upon the death of the insured. The payment of COI charges to cover Phoenix's risk is the policy's insurance component. *See id.*

The PAUL policies also have a savings component. Any premiums that a policyholder chooses to pay in excess of the monthly insurance expenses are added to a policy's "accumulated policy value." The accumulated policy value functions like a savings account; it accrues interest for the policyholder at a rate that Phoenix may adjust periodically but cannot set below a guaranteed minimum of 4%. *See id.; id.* Ex. A at 9; *id.* Ex. B at 6. This interest is added to the accumulated policy value.

In any given month, a PAUL policyholder has the option of allowing her monthly insurance expenses to be paid out of the accumulated policy value (her "savings account") rather than paying in more premiums. So long as the accumulated policy value stays high enough to cover the monthly expenses, the policy will not lapse.

This feature gives the policyholder the flexibility to invest her capital in other, more lucrative investments. Because of these characteristics, Phoenix allegedly marketed PAUL policies as "present[ing] the opportunity to pay lower premiums, as well as adjust the amount and timing of premium payments." Compl. at ¶ 2.

For Plaintiff Berck's policy ("the Loeb policy"), the monthly COI charge is calculated by multiplying his COI rate by the difference between his face value ($10 million) and his accumulated policy value. *See id.* Ex. A at 10. This COI charge is deducted from the Loeb policy's accumulated policy value.

The PAUL policies permit Phoenix to adjust the COI rates periodically. According to Plaintiffs, however, these contracts only allow Phoenix to consider certain enumerated factors when making such adjustments. Under the terms of the Loeb policy, these factors include age, sex, risk class, policy duration, and Phoenix's "expectations of future investment earnings, mortality, persistency and expense/administrative costs." *Id.* at 11. The Loeb policy does not allow Phoenix to consider a policyholder's accumulated policy value in setting his COI rate. It also requires Phoenix to make any adjustments to COI rates prospectively and "on a uniform basis for all insureds in the same class." *Id.* The language in Plaintiff Fleisher's policy ("the Moss policy") is very similar to the language in the Loeb policy. *See id.* Ex. B at 12.

### B. The 2010 and 2011 Cost of Insurance Rate Increases

According to Plaintiffs, on two separate occasions in 2010 and 2011, Phoenix breached their PAUL insurance contracts by raising the COI rates applicable to hundreds of policies. Plaintiffs originally brought these claims on behalf of two pu-

tative classes: the policyholders subjected to the 2010 COI rate increase ("the 2010 Class") and the policyholders subjected to the 2011 COI rate increase ("the 2011 Class"). *See* Compl. at ¶¶ 36–37. The former was represented by Berck (though that class has since been decertified), and the latter is represented by Fleisher.

The allegedly improper basis for the 2010 COI rate increase was the "funding ratio"—the ratio of each policy's accumulated policy value to its face value. It is undisputed that in March 2010, Berck—as trustee of the Loeb Trust—received a letter from Phoenix announcing the 2010 COI rate increase. It stated:

> We are sending you this letter to inform you that on April 1, 2010, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies. Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 11/1/2010 *unless your accumulated policy value is maintained at a sufficient level.*
>
> The amount of the increase will vary based on the accumulated amount of your policy value. In general, *maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate the increase . . .*
>
> If you have any questions or would like information about how you may reduce or eliminate the rate increase, please contact us at (800)541–0171.

Berck Decl. dated Jan. 11, 2013 ("Berck Decl.") Ex. B (emphasis added); Def. 56.1 Statement dated Sept. 9, 2013 ("Def. 56.1 Statement") at ¶¶ 7–10. The Complaint alleges that Phoenix only sent such letters to a subset of PAUL policyholders, not to all insureds in this class; it estimates that 700 of the thousands of PAUL policies were affected. *See* Compl. at ¶¶ 26, 62.

Fleisher (as trustee of the Moss Trust) allegedly received a similar letter in October 2011 stating that Phoenix was raising the COI rates on his policy. *See id.* at ¶ 32.

According to Berck, the 2010 COI rate increase breached his insurance contract in two ways. First, Phoenix adjusted the COI rate on an impermissible basis, since neither the policy's funding ratio nor its accumulated policy value (which is used in calculating the funding ratio) is enumerated in the contract as a permissible basis for adjusting the COI rate. *See id.* at ¶¶ 27, 29.

Second, the 2010 COI rate increase did not apply uniformly to a class of insureds. Berck alleges that it only affected a subset—roughly 700—of the thousands of similar PAUL policies in the same class. He alleges that these policies were targeted because their owners are "life settlement investors"—investors who purchase life insurance policies on the secondary market. *See id.* at ¶¶ 3–7, 33. In general, such investors are unlikely to allow their PAUL policies to lapse, since they purchase them purely as investment vehicles. Because life insurance companies make a windfall on the premiums they collect on lapsed policies, policies owned by life settlement investors can be less profitable. *See id.* at ¶¶ 3–7.

Phoenix's alleged motive for the 2010 COI rate increase was the desire to induce life settlement investors with low accumulated policy values to either (1) invest more in premiums or (2) allow their policies to lapse. And if these policyholders did nothing in response to the rate increase, they would just pay Phoenix more in COI charges. Under any of these scenarios, Phoenix would make more money. *See id.* at ¶ 8.

The Complaint alleges that the 2010 COI rate adjustment resulted in drastic annual increases in COI charges. For a PAUL policy with a $10 million face value

(such as Berck's), Phoenix increased COI charges by $76,800 during the first year the increase took effect, $46,700 the second year, $30,500 the third year, $30,300 the fourth year, $17,300 the fifth year, and $16,500 the sixth year. *See id.*

Faced with the prospect of paying steep monthly COI charges, Berck invested $700,000 in extra premiums in an attempt to do what Phoenix's March 2010 letter suggested: "maintain[ ] [his accumulated policy value] at a sufficient level" in order to "eliminate the rate increase." *Id.* at ¶ 26; Berck Decl. at ¶ 5. Berck refers to this payment of extra premiums as a "forced loan." Pl. Opp. at 7. Phoenix added the $700,000 to Berck's accumulated policy value, credited him with 4% interest, and deducted its usual monthly fees. Berck alleges that these fees included a 5% sales charge, which amounted to $35,000 on his $700,000 in premiums. *See id.* at 2. Berck concedes, however, that he completely avoided paying any increase in COI charges. *See* Berck Decl. at ¶ 5.

### C. The 2010 Interest Rate Decrease

Berck also alleges that Phoenix breached his insurance contract in a second way. In addition to increasing COI rates on the subset of PAUL policies in 2010, Phoenix allegedly added insult to injury by simultaneously decreasing the rate at which the these policies earned interest on their accumulated policy values. Consequently, the Complaint asserts, "if a policyholder chose to increase its accumulated policy value in order to avoid the COI increase, they would not earn the same rate of return as other policies of the same class." Compl. at ¶ 31. Phoenix admits that "certain of the policies subject to a cost of insurance rate increase were also subject to an interest rate decrease." Answer at ¶ 31.

According to the Complaint, this 2010 interest rate decrease violated Berck's insurance contract. Berck alleges that, as in the case of the COI rates, Phoenix may only consider certain enumerated factors in adjusting interest rates: Phoenix's "anticipation of future investment earnings, mortality, persistency, and expense/administration costs." Compl. at ¶ 31; *see also id.* Ex. A at 9. The accumulated policy value is not one of these enumerated factors. Berck further alleges that his policy requires interest rate adjustments to be "in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered," and that these standards "prohibit unfair discrimination between insureds of the same class with respect to any rates, terms, or conditions of a life insurance policy." Compl. at ¶ 31 (citing N.Y. Ins. Law § 4224(a)).

Berck contends that Phoenix's 2010 interest rate decrease breached this contract because it was based on an impermissible factor (the accumulated policy value) and implemented in a way that discriminated within a class of insureds.

Thus, two separate breaches of contract are alleged in Berck's Complaint: the 2010 COI rate increase and the 2010 interest rate decrease. Berck does not allege that he was impacted by the 2011 COI rate increase.

### D. The New York State Insurance Department Settlement

In 2011, the New York State Insurance Department ("NYSID"),[1] the state agency responsible for supervising and regulating insurance carriers, investigated Phoenix's 2010 COI rate increase. In a directive dated September 6, 2011, NYSID informed

---

1. The New York State Insurance Department has since been consolidated with another agency and renamed the New York Department of Financial Services.

Phoenix of its conclusion that the rate hike violated the contract rights of all holders of the affected insurance policies, because "there is no language in the policy that states that Phoenix will take into consideration a funding ratio of the policy's accumulated value to the face amount when adjusting COI rates." Sklaver Decl. dated Jan. 11, 2013, Ex. J at 1 (NYSID Order, Sept. 6, 2011). The agency also concluded that Phoenix had violated multiple sections of the New York Insurance Law. NYSID "directed" Phoenix to submit a plan to implement remedial action. *See id.* at 3.

While Phoenix insisted that it had done nothing wrong, it agreed to reverse the 2010 COI rate increase as part of a settlement with NYSID. In accordance with this settlement, Phoenix recalculated the policyholders' accumulated policy values to what they would have been had the 2010 COI rate increase never been implemented; it restored the previously-deducted COI charges and credited the policies with an additional 4% interest (the guaranteed minimum contractual rate) on those deductions. *See* O'Connell Decl. dated Feb. 1, 2013 ("O'Connell Decl.") at ¶ 30; *id.* Exs. A, B; Def. Memo at 5.

Berck, however, was out of luck. The settlement did not benefit him in any way, since he had chosen to make the so-called "forced loan" rather than pay COI charges at the increased rate. The settlement just described offered him no relief.

### E. Procedural History

On July 15, 2013, the Court initially certified both the 2010 Class (represented by Berck) and the 2011 Class (represented by Fleisher). The 2010 Class was defined as:

All owners of flexible-premium "universal life" insurance policies issued by Phoenix Life Insurance Company that were subjected to the Cost of Insurance rate increase announced by Phoenix on or about April 1, 2010, and who were seeking the interest differential on sums already repaid to class members who were adversely affected by the 2010 COI increase.

*Fleisher v. Phoenix Life Ins. Co.,* No. Civ. 8405(CM)(JCF), 2013 WL 4573530, at *1 (S.D.N.Y. Aug. 26, 2013). The class was certified because, as the Court then understood Plaintiffs' argument, all members of the 2010 Class shared a common question of law and fact because they were all asserting only a claim for an alleged underpayment of interest.

In response to Plaintiffs' subsequent motion for reconsideration of the certification order, I decertified the 2010 Class. The reader is referred to *Fleisher v. Phoenix Life Ins. Co.,* No. Civ. 8405(CM)(JCF), 2013 WL 4573530 (S.D.N.Y. Aug. 26, 2013) for the reasons why. In brief, I belatedly realized that the not everyone who was originally subject to the 2010 COI rate increase was only asserting a claim for underpaid interest, and that the purported class members who were claiming other types of damages—Berck among them—were not sufficiently numerous, and their claims were not sufficiently common, to warrant class treatment. Berck, who could not represent the group that was seeking only an interest differential, was permitted to pursue his claims individually.[2]

While the reconsideration motion was pending, Defendant Phoenix moved to dismiss the claims of all class members who were seeking the interest differential, on the ground that the court lacked subject matter jurisdiction to entertain them. In

**2.** No new plaintiff emerged to represent the large group of 2010 potential class members who were seeking the interest differential;

that claim, as I understand it, has been dropped.

the alternative, Phoenix moved for partial summary judgment. Phoenix did not withdraw its motion after the 2010 Class was decertified; instead, in its reply brief, it effectively recast its argument as being made in order to obtain dismissal of, or partial summary judgment on, Berck's individual claim.

The original motion, as made, is denied as moot. Insofar as the motion has been redirected to Berck alone, it is denied.

## DISCUSSION

### I. Standard of Review

To survive a motion to dismiss for lack of subject-matter jurisdiction based on standing pursuant to Rule 12(b)(1), the plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir.2011). If the defendants challenge only the legal sufficiency of the jurisdictional allegations, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 (2d Cir.2001). Where the defendants place jurisdictional facts in dispute, however, the court may properly consider "evidence relevant to the jurisdictional question [that] is before the court." *Id.; see also Amidax,* 671 F.3d at 145.

A party is entitled to summary judgment pursuant to Rule 56 when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v.* *Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Finally, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-moving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### II. The Motion to Dismiss Is Denied.

#### A. Standing

Defendant Phoenix moves to dismiss Berck's claim on the ground that the Court lacks subject matter jurisdiction, since Berck lacks standing. *See* Def. Reply at 1. The motion is denied.

As noted in the Court's decision decertifying the 2010 Class, the injury alleged by Berck differs from the injury allegedly

suffered by the vast majority of the 2010 Class. Most of the members of the former 2010 Class paid the 2010 COI rate increase and then received a refund from Phoenix, pursuant to a settlement negotiated between Phoenix and NYSID; their injury consisted of an alleged underpayment of interest. Berck, by contrast, alleged that he was injured in two separate and distinct ways.

First, Berck did not pay the COI increase. Instead, he invested an additional $700,000 in his "savings account" with Phoenix in order to avoid paying the COI increase. *See* Pl. Opp. at 2. Berck refers to this investment as a "forced loan" to Phoenix. If the 2010 COI rate increase violated the terms of his insurance contract (as Berck claims it did), he believes Phoenix should give him back that money, since he would never have invested it with Phoenix but for his desire to avoid paying the extra-contractual COI. Berck cannot simply withdraw the money himself, because he would incur substantial fees if he did so (a "partial surrender charge" plus a $25 "withdrawal fee"). *See* Compl. Ex. A at 11–12. He is seeking a refund of the $700,000 without having to pay the associated penalties, and with interest from the date he parted with the money.[3] *See* Pl. Opp. at 2.

Second, Phoenix reduced the rate at which Berck accrued interest on his accumulated policy value from an unspecified higher interest rate to only 4% (the minimum guaranteed rate), also in violation of the insurance contract. *See* Compl. at ¶ 31.

Berck alleges that he was injured—not in the same way as other members of the now-decertified 2010 Class, but sufficiently to withstand any argument that he lacks standing to sue because he suffered no injury.

Phoenix contends that Berck has suffered no injury in fact because he received the "benefit of his bargain"—all the interest to which he was contractually entitled for investing the extra $700,000 in his policy. *See* Def. Reply at 5. Phoenix bases this argument on the fact that it added $700,000 to Berck's accumulated policy value and paid him 4% interest (the minimum contractual rate). With respect to the $35,000 "sales charge" deduction, Phoenix characterizes this charge as part of the price to which Berck agreed in order to obtain "benefits" (4% interest) under the insurance contract. *See id.* Thus, Phoenix maintains that Berck has suffered no injury.

■ Phoenix misses the point entirely. Berck's claim is that he did not want to receive the "benefit of his bargain" on the $700,000 he invested in order to avoid the 2010 COI rate increase; he alleges that he would never have invested that money with Phoenix, but would have used it for some other purpose (perhaps earning a greater rate of interest than 4%) but for his desire to avoid payment of the 2010 COI rate increase. He claims that he invested the money—losing $35,000 of it right off the bat in unwanted "sales charges" and earning a low 4% interest rate—only because he was coerced into doing so.

Second, Berck disputes Phoenix's contention that he did in fact receive the benefit of his bargain, in the form of the correct interest rate. The Complaint alleges that Phoenix decreased the interest rate for the subset of affected PAUL policies to 4% in violation of their contract

---

**3.** Berck alleges that Phoenix deducted $35,000 of the $700,000 to pay itself a "sales charge" for "selling" him the opportunity to invest the additional $700,000. He wants that money back. *See* Pl. Opp. at 2. Since it is part of the $700,000, a refund of that fee is encompassed in his claim for the return of the $700,000.

terms; Berck asserts that this interest rate adjustment was based on impermissible factors and was implemented a manner that discriminated within a class of insureds. *See* Compl. at ¶ 31. Phoenix admits that some of the policies subjected to the 2010 COI rate increase were also subjected to an interest rate decrease. *See* Answer at ¶ 31. Phoenix has given no reason why Berck should not be permitted to seek this loss of interest as damages.

Given Berck's allegations that Phoenix's two 2010 breaches caused him to suffer economic harm, he has sufficiently alleged an injury traceable to Phoenix that is likely redressable in this suit. He thus has standing to bring suit for breach of contract. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Accordingly, Phoenix's motion to dismiss Berck's claim for lack of standing is denied.

### B. CAFA Jurisdiction

The real issue here, which the Court raises *sua sponte,* is whether Berck's claim must be dismissed for lack of subject matter jurisdiction because it is a claim arising under state law between non-diverse parties. Both Berck and Phoenix are residents of New York. *See* Compl. at ¶¶ 12, 14. If Berck had brought his breach of contract claim on his own (without making class action allegations), this Court would have lacked diversity jurisdiction over his claim under 28 U.S.C. § 1332(a).

But the Complaint invokes this Court's jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Under CAFA, federal district courts have original jurisdiction over any class action with at least 100 class members, an amount-in-controversy exceeding $5 million, and minimal diversity—diversity between any plaintiff class member and any

defendant. *See* 28 U.S.C. §§ 1332(d)(2) and (d)(5)(B).

Plaintiffs Berck and Fleisher initially sought certification of two classes, which they alleged met CAFA's requirements—the classes allegedly (1) had at least 100 members, (2) sustained aggregate damages of over $5 million, and (3) were minimally diverse with Defendant Phoenix. Given the Complaint's jurisdictional allegations, this Court held that it had subject matter jurisdiction at the time the suit was filed. *See* Docket No. 29 at 8.

However, this Court has since decertified the class represented by Berck. *See Fleisher,* 2013 WL 4573530, at *4. One might argue that this development divested the Court of jurisdiction over Berck's claim, because there is no longer any "class action" within the meaning of CAFA, concerning the 2010 COI rate increase and its implications for policyholders.

CAFA does not speak directly to the issue of whether class certification is a prerequisite for federal court jurisdiction, and the Second Circuit has never ruled on whether jurisdiction acquired pursuant to CAFA is lost when the matter ceases to be a class action. But every circuit court to consider the issue has held that federal jurisdiction under CAFA does not depend on class certification; a federal court has jurisdiction over a putative class action both before certification is granted and after certification is denied, as long as the class originally sought to be certified met CAFA's requirements at the time the case was filed. *See Buetow v. A.L.S. Enters., Inc.,* 650 F.3d 1178, 1182 n. 2 (8th Cir. 2011); *Metz v. Unizan Bank,* 649 F.3d 492, 500–01 (6th Cir.2011); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO, CLC v. Shell Oil Co.,* 602 F.3d 1087, 1091–92 (9th Cir.2010); *Cun-*

ningham Charter Corp. v. Learjet, Inc., 592 F.3d 805, 807 (7th Cir.2010); Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1268 n. 12 (11th Cir.2009).

In the leading case on this jurisdictional issue, Cunningham Charter Corp. v. Learjet, Inc., 592 F.3d 805 (7th Cir.2010), the Seventh Circuit reasoned that CAFA jurisdiction must not depend on certification, because the statute defines a "class action" as "any civil action filed under rule 23" or similar state class action rules. 28 U.S.C. § 1332(d)(1)(B) (emphasis added). The court also stressed that its holding "vindicate[d] the general principle that jurisdiction once properly invoked is not lost by developments after a suit is filed, such as a change in the state of which a party is a citizen that destroys diversity." Cunningham, 592 F.3d at 807 (citing St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 293–95, 58 S.Ct. 586, 82 L.Ed. 845 (1938)).

There is one caveat to this general rule. "[I]f the jurisdictional allegations are frivolous or defective from the outset, then jurisdiction never existed in the first place, regardless of the plaintiff's invocation of a class action under CAFA." Metz, 649 F.3d at 501 n. 4; see also Cunningham, 592 F.3d at 806 ("Frivolous attempts to invoke federal jurisdiction fail, and compel dismissal").

Two of my colleagues have followed this line of cases. See Certain Underwriters at Lloyd's of London v. Illinois Nat. Ins. Co., No. 09 Civ. 4418(LAP), 2012 WL 4471564, at *6 (S.D.N.Y. Sept. 24, 2012); Weiner v. Snapple Beverage Corp., No. 07 Civ. 8742(DLC), 2011 WL 196930, at *2 (S.D.N.Y. Jan. 21, 2011). In Weiner, the court noted that its decision "accord[ed] with the general proposition, endorsed by the Second Circuit, that federal jurisdiction is determined at the outset of the litigation." Id. (citing LeBlanc v. Cleveland, 248 F.3d 95, 100 (2d Cir.2001)).

■ This is not a case in which Plaintiffs' invocation of CAFA was frivolous; the Court initially certified both classes. The 2010 Class members did have a common question of fact, but it turned out that Berck was not an adequate representative of the class. Thus, the Complaint's jurisdictional allegations were not frivolous. So if jurisdiction is not divested by failure to certify, this court retains CAFA jurisdiction over Berck's individual claim, see Cunningham, 592 F.3d at 807, even though Berck could not have filed a lawsuit in any federal court asserting his individual claim without running afoul of the Constitution and 28 U.S.C. § 1332.

I cannot pretend to be happy with this result. This breach of contract case between two New York residents belongs in the New York State Supreme Court. The idea that simply alleging the existence of a CAFA class confers extra-constitutional jurisdiction for all time—even when the action ceases to proceed as a class action—is deeply troubling. Class action allegations are easily made, and when CAFA was passed, classes were easily certified. The latter is no longer the case. See Comcast Corp. v. Behrend, —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013); Wal–Mart Stores, Inc. v. Dukes, —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The notion that plaintiffs can manufacture federal jurisdiction by making classwide allegations that turn out not to be certifiable, for whatever reason, is deeply troubling.

Given the unanimity among the Circuit Courts of Appeal on the issue of divestment of jurisdiction—a view supported by the literal language of the statute—I conclude that I have jurisdiction to entertain Berck's individual claim. Because this is an area ripe for abuse, Congress may well wish to take a second look at CAFA, and

to make specific provision for what ought to happen when no class is certified.

Phoenix's motion to dismiss for lack of subject matter jurisdiction is denied.

## III. The Motion for Summary Judgment Is Denied.

### A. Anticipatory Repudiation

Phoenix moves in the alternative for summary judgment dismissing Berck's claim on the ground that its own anticipatory repudiation of the contract bars Berck's claim for damages. *See* Def. Reply at 1–3. The motion is denied.

This odd argument goes as follows: assume that the 2010 COI rate increase did violate the terms of the insurance contract, as Berck alleges (and NYSID found). Assume further that the consequences of this induced Berck to invest an extra $700,000 in his accumulated policy value. However, all Phoenix did was announce its intention to breach the contract; Berck did not actually pay the increased COI, so Phoenix did not "breach" the contract as to him. Rather, its announcement should be treated as an anticipatory repudiation of the contract, for which Berck cannot recover damages since he—the non-breaching party—chose to continue to perform under the contract and to receive its benefits. *See* Def. Memo at 10–14 (citing *Sequa Corp. v. Gelman,* No. 91 Civ. 8675, 1996 WL 79876, at *3 (S.D.N.Y. Feb. 23, 1996)).

There are two problems with this argument.

First, Berck also claims that Phoenix breached the insurance contract by reducing the interest rate paid to him on his accumulated policy value from an unspecified rate to only 4%. That alone is sufficient to keep this case going.

Second, insofar as we are talking about the "forced loan" aspect of the case, it does not rest on any anticipatory repudiation.

■ A repudiation is "a statement by the obligor to the obligee indicating that the obligor will commit a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 463, 682 N.Y.S.2d 664, 705 N.E.2d 656 (N.Y.1998) (quoting Restatement [Second] of Contracts § 250 (1981)). Under the doctrine of anticipatory repudiation, "when a party repudiates contractual duties 'prior to the time designated for performance and before' all of the consideration has been fulfilled, the 'repudiation entitles the nonrepudiating party to claim damages for total breach.'" *Id.* at 462–63, 682 N.Y.S.2d 664, 705 N.E.2d 656 (quoting *Long Is. R.R. Co. v. Northville Indus. Corp.,* 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 362 N.E.2d 558 (N.Y.1977)).

■ But not every breach of contract is a repudiation, and no fact is here alleged indicating that Phoenix repudiated its duties—notably, its duty to pay death benefits—under Berck's insurance contract. Phoenix announced that it was raising Berck's COI rate to a level not authorized by the contract—a breach, but not a repudiation. The damages alleged by Berck (his making a "forced loan" to Phoenix, which damaged him at least to the tune of the $35,000 he paid in sales charges, and which possibly entitles him to rescission of the "forced loan" without penalty) do not stem from Phoenix's walking away from the contract—from any announcement that Phoenix did not intend to perform under the contract when its performance was called for—but rather from a breach that, while material, did not rise to the level of a repudiation. This contorted argument falls of its own weight.

### B. Statutory Prejudgment Interest

Phoenix also moves for summary judgment dismissing Berck's claim for statuto-

ry prejudgment interest on the damages he suffered. *See* Def. Memo at 9–14.

Under New York law, any "sum awarded" in a breach of contract action accrues interest at 9%—the statutory prejudgment interest rate. *See* N.Y. C.P.L.R. §§ 5001, 5004. Thus, when a plaintiff proves that she has suffered consequential damages from a breach and is awarded those damages, the court must also award the plaintiff 9% interest on those damages. This interest rate applies from the point at which the breach of contract claim accrues until the date of the jury's verdict. *See id.* §§ 5001(b) and (c).

Berck contends that he is entitled to statutory prejudgment interest on the consequential damages he suffered from Phoenix's breach. Phoenix seeks summary judgment "dismissing" this aspect of the prayer for relief—effectively, it seeks a declaratory judgment that Berck's claim is not subject to New York's statutory interest rate.

This motion is denied as premature. The proper calculation of interest—a function for the Court, not the jury—is best left until after trial, after we see whether any damages are awarded and what they might be.

### CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss and motion for partial summary judgment are denied. The Clerk of the Court is directed to close out the motion at Docket No. 147 and to remove same from the Court's list of pending motions.