APWU, AFL–CIO, Dennis O'Neil, William M. Smith, as President and on behalf of New York Metro Area Postal Union, Thomas K. Duane, as a member of the Senate of New York, 27th District, Christine Quinn, as a member of the Council, 2nd District, Transport Workers Union of America, Plaintiffs–Appellants,

v.

John E. POTTER, Postmaster General of the United States, Defendant–Appellee.

Docket No. 02–6186.

United States Court of Appeals, Second Circuit.

Argued: Aug. 5, 2003.

Decided: Sept. 15, 2003.

Louie Nikolaidis, Lewis, Greenwald, Clifton & Nikolaidis, P.C. (Peter Henner and Daniel E. Clifton, of counsel, on the brief), New York, NY, for Plaintiffs–Appellants.

Sheila M. Gowan, Assistant United States Attorney, Southern District of New York (James B. Comey, United States Attorney, Beth E. Goldman, Assistant United States Attorney, on the brief), New York, NY, for Defendants–Appellees.

Before: JACOBS and SOTOMAYOR, Circuit Judges.*

JACOBS, Circuit Judge.

The United States District Court for the Southern District of New York (Keenan, J.) dismissed for lack of jurisdiction claims asserted against John E. Potter, United States Postmaster General, arising out of the clean-up of anthrax contamination by the United States Postal Service ("USPS") at its Morgan Processing and Distribution Center ("Morgan"). The action was brought by the New York Metro Area Postal Union, APWU, AFL–CIO; its president, William M. Smith; and Dennis O'Neil, a postal worker employed at Morgan. They sought declaratory and injunctive relief, as well as attorneys' fees and costs, under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and New York State environmental laws. Plaintiffs alleged that the actions taken by the USPS in the investigation and clean-up of the anthrax contamination at Morgan in late 2001 created an imminent and substantial endangerment to health or the environment, in violation of federal and state permit requirements relating to the transportation, storage, and disposal of hazardous wastes. The dismissal was based on § 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., which bars jurisdiction in suits challenging certain ongoing CERCLA "removal actions." See id. § 9613(h).

Plaintiffs Smith and O'Neil argue that the cleanup at Morgan was not a CERCLA "removal action," because the USPS lacked power to undertake CERCLA "emergency" removal actions, and the anthrax situation at Morgan constituted such an "emergency." We affirm.

## BACKGROUND

Morgan, the central mail-processing facility in New York City, is a two million square foot operation occupying two city blocks in midtown Manhattan and employing 5,000 people. The main post office, James A. Farley Station ("Farley"), is nearby and connected by tunnel.

On October 19, 2001, the Centers for Disease Control and Prevention ("CDC") confirmed the presence of *bacillus anthracis,* or anthrax, in several letters that had been sent by mail more than four weeks earlier to NBC Studios and to the New York Post. Anthrax spores are known to

---

* The Honorable Fred. I. Parker, who was a member of the panel, died following argument, and the appeal is being decided by the remaining two members of the panel, who are in agreement. See 28 U.S.C. § 46(b); Local R. § 0.14(b).

cause an acute infectious disease in humans if they enter the body through an open wound, cut, or mucous membrane (such as the mouth or nose). Alerted by the CDC, the USPS conducted an investigation and determined that the letters had entered the United States postal system in Trenton, New Jersey and were processed on September 19, 2001 through one or more of the Delivery Bar Code Sorting ("DBCS") machines at Morgan.

Two days after the CDC alert, the USPS started testing at Morgan and certain other postal facilities in New York. Private environmental consultants collected and tested hundreds of environmental samples. Results received several days later indicated the presence of anthrax in samples taken from four DBCS machines on the third floor of the southern portion of Morgan. These four machines were taken out of service, and the area around them was sealed. Additional testing the next day implicated a fifth (adjacent) machine, which was immediately taken out of service as well.

On October 26, the CDC provided antibiotics, gloves, and face masks to more than 7,000 postal employees at Morgan, Farley, and various other Manhattan postal facilities. At this point—more than five weeks after the contaminated letters had passed through—no postal employee in New York had reported any kind of anthrax-related health problem.

On the same day (October 26), plaintiffs served the USPS, the United States Environmental Protection Agency ("EPA") regional administrator, and the United States Attorney General with a Notice of Intent to file an action against the USPS under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), which permits civil suits against any person or entity, including the federal government, "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* On October 29, plaintiffs filed a complaint pursuant to RCRA and state law, seeking (*inter alia*): (1) a declaration that the USPS's handling of the anthrax contamination was in violation of RCRA and the New York State Environmental Conservation Law, (2) an injunction against the continued operation of Morgan pending a court determination that it was free of anthrax, (3) an order requiring testing at various mail facilities, and (4) an order permitting plaintiffs to inspect Morgan (as well as an award of costs, including attorneys' fees and expert witness fees).

Between November 1 and November 13, cleanup and decontamination work was conducted at Morgan 24 hours a day by approximately 200 employees of an environmental contractor hired by the USPS. This work was performed in cooperation with the CDC under the supervision of a third-party monitoring consultant. The contaminated area was sealed off and isolated with a plastic barrier.

While the cleanup was ongoing, plaintiffs moved for a preliminary injunction to compel the USPS to close Morgan completely for a more comprehensive decontamination, and to force testing for anthrax at Farley and various other postal facilities downstream from Morgan in the mail delivery system. At a preliminary injunction hearing held on November 6–9, 2001, experts gave conflicting estimates of the danger level presented by the processing of anthrax-contaminated letters at Morgan, and of the efficacy of the cleanup effort mounted by the USPS.

In a ruling issued at the conclusion of the hearing on November 9, and subsequently clarified in a November 15, 2001 published order, the district court granted

the motion for testing at Farley, but declined to shut down Morgan, finding that "there is no imminent and substantial danger present." *Smith v. Potter ("Smith I")*, 187 F.Supp.2d 93, 98 (S.D.N.Y.2001). The court noted that no postal worker at Morgan had come down with the disease in the weeks between the transit of the contaminated letters and the start of the CDC investigation, and credited testimony from Dr. Stephen Ostroff, the Chief Epidemiologist for the CDC's Infectious Diseases Center (and the person in charge of the federal government's anthrax investigation in New York), that "the amount of anthrax 'tracked through' Morgan does not 'continue to pose an ongoing public health risk.' " [1] *Id.* at 96.

After the hearing, the USPS finished the cleanup and took post-cleanup samples for testing. The only sample that tested positive for anthrax was taken from one of the five suspect DBCS machines. It was immediately sealed off and recleaned. Afterward, all tests for anthrax at Morgan were negative. The USPS provided the district court and the plaintiffs with a full report of the testing at both Morgan and Farley. All told, the investigation and cleanup of the anthrax there cost over $15 million.

On January 8, 2002, the USPS executed an Action Memorandum which provided that its actions at Morgan had been undertaken pursuant to section 104 of CERCLA, which authorizes the Postmaster General, under authority delegated by the President of the United States pursuant to Executive Order No. 12580, to conduct "removal actions" for the cleanup and removal of hazardous substances, pollutants, and contaminants. The USPS then published a notice in two New York City newspapers that the administrative record for the CERCLA removal action would be available for review, and that USPS would accept public comment on this record for a period of 30 days. Several days later, the government moved pursuant to Fed. R.Civ.P. 12(b)(1) to dismiss plaintiffs' complaint for lack of subject matter jurisdiction on the ground that their claims were precluded by § 113(h) of CERCLA, 42 U.S.C. § 9613(h), which bars federal jurisdiction in suits challenging certain ongoing CERCLA "removal actions" for hazardous substances, pollutants, or contaminants.[2] Plaintiffs opposed the motion on the ground that the USPS's actions at Morgan could not be a CERCLA removal action because the USPS lacked authority over "emergency" removal actions.

The district court granted the motion to dismiss, relying largely on its earlier factual findings. *Smith v. Potter ("Smith II")*, 208 F.Supp.2d 415, 419–20 (S.D.N.Y.2002). Plaintiffs appealed.

## DISCUSSION

Plaintiffs bear the burden of "showing by a preponderance of the evidence that subject matter jurisdiction exists." *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir.2003) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). In considering a

---

1. The court noted the contrary testimony of plaintiffs' expert, but rejected it on the ground that Dr. Ostroff's testimony was more credible. *Smith I*, 187 F.Supp.2d at 96.

2. Defendant also moved, in the alternative, to have plaintiffs' claims dismissed pursuant to Rule 12(b)(6), for failure to state a claim. The district court did not reach this issue. *See Smith v. Potter ("Smith II")*, 208 F.Supp.2d 415, 416–22 (S.D.N.Y.2002).

dismissal for lack of jurisdiction, we review the district court's factual findings for clear error and its legal conclusions *de novo. See Wake v. United States,* 89 F.3d 53, 57 (2d Cir.1996) (citing *In re Vogel Van & Storage, Inc.,* 59 F.3d 9, 11 (2d Cir. 1995)).

# I

Section 113(h) of CERCLA provides that, except in limited circumstances not relevant to this appeal, "[n]o Federal court shall have jurisdiction ... to review any challenges to removal or remedial action selected under [CERCLA section 104.]" 42 U.S.C. § 9613(h). This "clear and un-equivocal" provision is a "blunt withdrawal of federal jurisdiction" over challenges to ongoing CERCLA removal actions, including those brought under RCRA. *McClellan Ecological Seepage Situation v. Perry,* 47 F.3d 325, 328 (9th Cir.1995) (internal quotation marks omitted). *See also Costner v. URS Consultants, Inc.,* 153 F.3d 667, 674 (8th Cir.1998) ("In enacting section 113(h), Congress intended to prevent time-con-suming litigation which might interfere with CERCLA's overall goal of effecting the prompt cleanup of hazardous waste sites." (internal quotation marks omitted)).

The jurisdictional bar of Section 113(h) is triggered by an ongoing removal action undertaken pursuant to section 104 of CERCLA, which provides that whenever any hazardous substance, pollutant, or con-taminant "is released or there is a substan-tial threat of such a release into the envi-ronment," the President is empowered to undertake a "removal action." 42 U.S.C.

§ 9604(a). The term "pollutant or contam-inant" is defined in CERCLA to include "any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, ... will or may reasonably be anticipated to cause death [or] disease ...." 42 U.S.C. § 9601(33). "Removal actions" are defined broadly to include not only the cleanup and removal of such things, but also the under-taking of studies, investigations, testing, and other information gathering activities "to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollu-tants or contaminants involved, and the extent of danger to the public health or welfare or to the environment." *Id.* § 9604(b); *see also id.* § 9601(23).

 Anthrax falls within CERCLA's definition of "pollutant or contaminant," *see* 42 U.S.C. § 9601(33), and the USPS's testing and cleanup activities at Morgan in late 2001 fall within the definition of "re-moval action" in CERCLA § 104. *See id.* § 9604(a) and (b). Plaintiffs do not argue otherwise. Rather, plaintiffs argue that only the EPA—not the USPS—was au-thorized to undertake a CERCLA § 104 removal action to investigate and remove the anthrax at Morgan.[3]

CERCLA § 104 gives authority over re-moval actions to the President, and § 115 allows the President to delegate this au-thority. *See* 42 U.S.C. §§ 9604, 9615. The President did so in Executive Order No.

---

**3.** Plaintiffs also argue that the USPS's actions did not comply with the CERCLA require-ment that removal actions comply with the CERCLA National Contingency Plan issued by the United States Environmental Protection Agency. This argument, however, was not raised in the district court, and we decline to consider it for the first time on appeal. *See Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d

89, 95 (2d Cir.2000). Even had it been raised, it is unclear, in light of our jurisdic-tional holding, that the district court could have addressed it. *See United States v. NL Indus., Inc.,* 936 F.Supp. 545, 551–52 (S.D.Ill., 1996) (holding that CERCLA § 113(h) precludes jurisdiction over chal-lenges to removal actions alleging non-com-pliance with National Contingency Plan).

12580, 52 Fed.Reg. 2923 (Jan. 23, 1987), which delegates "to the heads of Executive departments and agencies" the President's power over CERCLA § 104 "removal actions *other than emergencies,* where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies . . . ." *Id.* § 2(e)(1) (emphasis added). As to *emergency* removal actions, Executive Order No. 12580 delegates authority to act to the Administrator of the EPA, and gives the Administrator the authority to "define the term 'emergency,' solely for the purpose of this [delegation], either by regulation or by a memorandum of understanding with the head of an Executive department or agency." *Id.*

The EPA has not entered into a memorandum of understanding with the USPS defining "emergency" for purposes of CERCLA removal actions; but it has issued a definition of "emergency":

> For the purposes of the delegations [contained in Executive Order No. 12580], EPA considers an emergency to be a release or threat of release generally requiring initiation of a removal action within hours of the lead agency's determination that a removal action is appropriate. . . . EPA will respond only to those public health or environmental emergencies that the Federal agency cannot respond to in a timely manner.

Preamble to Proposed Rules, National Oil and Hazardous Substances Pollution Contingency Plan, 53 Fed.Reg. 51394, 51396 (Dec. 21, 1988). The district court relied on this definition of "emergency," and neither party to this appeal challenges the applicability of this definition.

The principal question presented on this appeal is therefore whether the anthrax contamination at Morgan amounted to an "emergency" (under the above-quoted definition of that term) for the particular purpose of a CERCLA removal action. For the reasons stated below, we agree with the district court that the limited anthrax contamination at Morgan did not amount to such an emergency.

## II

■ Plaintiffs advance several arguments that the USPS's actions were "emergency" actions: (1) the anthrax contamination at Morgan happened shortly after September 11, 2001, and must be viewed in that emergency context; (2) at the time of the Morgan anthrax investigation and cleanup, the USPS had closed *other* mail facilities at which anthrax had been discovered or suspected; (3) plaintiffs' expert, Dr. Jeanne Mager Stellman, a Professor of Public Heath at Columbia University, disagreed in part with the expert opinion of Dr. Ostroff as to the seriousness of the anthrax threat; and (4) the USPS "repeatedly asserted" that the anthrax situation was an "emergency" in various public and official documents and statements related to the investigation and cleanup at Morgan.

None of these points is persuasive. Measures taken at locations other than Morgan and the temporal proximity of the anthrax problem to the events of September 11 are not relevant to the urgency of the anthrax contamination at Morgan itself. In any event, there is no record evidence to show that the risks at other postal facilities (either closed or open) were comparable to those at Morgan, and no record evidence of any link between the anthrax at Morgan and the events of September 11. Use of the word "emergency" in memoranda or other official documents, press releases, or letters relating to the anthrax contamination is beside the point: the question is not whether the anthrax situation at Morgan was an emergency in general parlance; the question is whether

the removal action was an "emergency" removal action for purposes of the Presidential delegation in Executive Order No. 12580. No doubt, the anthrax contamination at Morgan was an extraordinary event that called for prompt measures. However, every CERCLA removal action involving a pollutant or contaminant (such as anthrax) is *by definition* an action to arrange for the investigation or removal of something that does or might pose an "imminent and substantial danger to the public heath or welfare." 42 U.S.C. § 9604(a)(1)(B).

As noted, the EPA defines "emergency" as "a release or threat of release generally requiring initiation of a *removal action* within hours of the lead agency's determination that a *removal action* is appropriate." 53 Fed.Reg. at 51396 (emphasis added). The definition of a "removal action" in CERCLA (set out in part below) is quite expansive:

> such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). According to plaintiffs, the EPA's definition of "emergency" and CERCLA's expansive definition of "removal action" should be read together so that almost any activity that is commenced "within hours of a lead agency's determination" that some kind of action is appropriate would be an emergency removal action.

■ Executive Order No. 12580, however, contemplates that some removal actions will be deemed emergencies, and that others will not (in other words, that emergency removal actions constitute a subset of all removal actions). "[A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that [a text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." *Silverman v. Eastrich Multiple Investor Fund,* 51 F.3d 28, 31 (3d Cir.1995) (internal quotation marks omitted). We therefore must interpret "emergency" to give it meaning in light of CERCLA's expansive definition of "removal action," while preserving the classification of removal actions (in Executive Order No. 12580) into those that are emergencies and those that are not.

■ We think it significant that Executive Order No. 12580 grants the EPA sole authority over the execution of emergency removal actions, and that the EPA's definition of "emergency" includes a statement that the EPA "will respond only to those public health or environmental emergencies that the [lead agency] cannot respond to in a timely manner." 53 Fed.Reg. at 51396. In the absence of more clear direction from the EPA—which would be welcome, to say the least—we therefore hold that emergency removal actions are removal actions in which (i) action must be taken within hours of the discovery of the possible release of a pollutant, contaminant, or hazardous substance, and (ii) the lead federal agency is unable to perform the removal action itself in a timely manner. *See* 42 U.S.C. § 9601(23); 53 Fed. Reg. at 51396.

Here, the situation did not call for action within hours, and the USPS was able to perform the removal action itself. By the time the anthrax release was discovered and the USPS became aware that a removal action might be necessary, more than a month had already elapsed. Even

then, the USPS's subsequent testing did not begin for several days. It is undisputed that no postal worker at Morgan reported an anthrax-related health problem of any kind, either before or after the USPS began its removal action. And as Dr. Ostroff testified at the preliminary injunction hearing, the risk to postal workers at Morgan was "very, very low." *Smith I*, 187 F.Supp.2d at 96. We see no error in the district court's decision to rely on the absence of reported illness, and to accept and credit Dr. Ostroff's testimony. The district court's factual findings are sufficient to support its conclusion that the anthrax contamination at Morgan was not an "emergency" within the meaning of the EPA's definition of that term for purposes of Executive Order No. 12580 and CERCLA.

### III

Plaintiffs additionally argue that: (1) the jurisdictional issue in this case is essentially factual, and jurisdiction therefore should not have been resolved by the court on a motion to dismiss; (2) the district court erroneously relied on evidence and findings related to the preliminary injunction hearing to resolve disputes related to jurisdiction, an issue not raised in the preliminary injunction hearing; and (3) the district court should have allowed for further discovery to resolve questions concerning the relationship between the USPS and the EPA.

"[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir.1999); *see also Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir.2000) (stating that when a defendant "challenge[s] the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.... [but must i]nstead ... go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss"). A "district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C.Cir.1984)). We think the district court acted within its discretion in relying on the whole record before the court to make factual findings with respect to jurisdiction.

*Phoenix Consulting* cautions, however, that a court should take care to "give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction,'" *id.*, and plaintiffs here contend that they needed additional discovery to explore "the relationship between the USPS and the EPA." Appellants' Br. at 22. Plaintiffs fail to articulate, however, why such evidence is relevant to the question of whether the anthrax investigation and cleanup at Morgan was an "emergency" within the meaning of the EPA's definition of that term for purposes of the Presidential delegation. In any event, we think it clear that plaintiffs had ample opportunity to uncover and present evidence relating to the events bearing on the jurisdictional question, and that the district court acted within its discretion in declining to grant further discovery.

### CONCLUSION

The judgment of the district court is affirmed.