15-2065(L)
*Arch Trading Corp. v. Republic of Ecuador*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: January 5, 2016　　Decided: October 14, 2016)

Docket No. 15-2065(L), 15-2106(con)

ARCH TRADING CORP., ARVIN PROPERTIES INC., HEZER HOLDINGS INC.,
MADEC LIMITED, OSIS INTERNATIONAL CORP.,

*Plaintiffs-Appellants*,

–v.–

THE REPUBLIC OF ECUADOR, a sovereign nation, FIDEICOMISO AGD-CFN NO MÁS
IMPUNIDAD, an agency or instrumentality of the Republic of Ecuador,
CORPORACIÓN FINANCIERA NACIONAL, an agency or instrumentality of
the Republic of Ecuador,

*Defendants-Appellees*.

B e f o r e :

POOLER, HALL, and CARNEY, *Circuit Judges*.

Five companies sue the Republic of Ecuador and two of its instrumentalities for claims arising out of the Ecuadorean government's alleged seizure of a number of the companies' assets in Ecuador beginning in July 2008.  Invoking the Foreign Sovereign Immunities Act (FSIA), the District Court (Crotty, *J.*) dismissed the action for want of subject matter jurisdiction.  We conclude that the plaintiff companies cannot invoke the FSIA's takings exception to sovereign immunity because the instrumentalities are not "engaged in a commercial activity in the United States," *see* 28 U.S.C. § 1605(a)(3), and

that the activities of various subsidiaries and separate entities are not imputable to them in light of the presumption of legal separateness established in *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). Accordingly, we AFFIRM the judgment of the District Court.

––––––––––––––

PEDRO J. MARTINEZ-FRAGA (Suzanne M. Berger, James M. Altman, C. Ryan Reetz, *on the brief*), Bryan Cave LLP, New York, NY, and Miami, FL, *for Plaintiffs-Appellants*.

ANDREW Z. SCHWARTZ, Foley Hoag LLP, Boston, MA, *for Defendants-Appellees*.

––––––––––––––

SUSAN L. CARNEY, *Circuit Judge*:

We are faced here with a question of subject matter jurisdiction over a dispute with a vanishingly thin, if any, connection to the United States. Plaintiffs-appellants are five entities incorporated in the British Virgin Islands. They claim that in 2008, an agency of the Republic of Ecuador unlawfully seized their "property in Ecuador"— primarily, their ownership of over 100 companies located there. Joint Appendix ("J.A.") at 12. In 2013, they filed suit in the Southern District of New York seeking over $1 billion in damages from defendants-appellees the Republic of Ecuador ("Ecuador") and two of Ecuador's instrumentalities—the Corporación Financiera Nacional ("CFN"), and Fideicomiso AGD-CFN No Más Impunidad (the "Trust"). The District Court (Crotty, *J.*) dismissed the Complaint with prejudice for want of subject matter jurisdiction.

The Foreign Sovereign Immunities Act (FSIA) establishes a general rule of immunity for foreign states "from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604; *see also* 28 U.S.C. § 1330. Only if the action in which the foreign state or its agency or instrumentality is named as the defendant falls within one

2

of the Act's several exceptions, *see* 28 U.S.C. § 1605, will jurisdiction lie.  Plaintiffs here

contend that their action fits within the FSIA's "takings" or "expropriation" exception,

set forth in Section 1605(a)(3).  Section 1605(a)(3) provides that a foreign state (including

its agencies and instrumentalities) is not immune from jurisdiction in any case

> in which rights in property taken in violation of international law are in issue and [1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3) (bracketed numbers added).  Both of the two independently

sufficient prongs of this subsection (here labeled [1] and [2]) are subject to the

precondition that the dispute concern property "taken in violation of international

law[.]"  *Id.*  Once this condition is met, the second prong then authorizes United States

courts to entertain an action against a foreign state's agency or instrumentality where

(a) either the taken property or "any property exchanged for such property" is

(b) "owned or operated by an agency or instrumentality of the foreign state" and (c) the

agency or instrumentality "is engaged in a commercial activity in the United States[.]"

*Id.*  In this appeal, we focus on the last element of this second prong: the agency or

instrumentality's engagement in commercial activity in the United States.

Plaintiffs do not contend that either CFN or the Trust is *itself* engaged in

commercial activity in the United States.  Rather, they argue primarily that we should

impute to each the United States activities of several other entities and on that basis

determine that CFN and the Trust are subject to jurisdiction under prong [2].  But CFN

and the Trust are entities distinct from the subsidiaries and other Ecuadorean entities to

which plaintiffs point.  The presumption of legal separateness established by the

3

Supreme Court in *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and respect for international comity compel us to treat these legally separate entities as just that, unless plaintiffs can demonstrate that CFN and the Trust exercise "significant and repeated control over the [entities'] day-to-day operations." *EM Ltd. v. Banco Cent. de la República Argentina*, 800 F.3d 78, 91 (2d Cir. 2015) ("*EM*"), *cert. dismissed*, 136 S. Ct. 1731 (2016). Plaintiffs have failed to clear this substantial bar and therefore have not satisfied the requirements of Section 1605(a)(3). Accordingly, Ecuador, CFN, and the Trust are protected by sovereign immunity under 28 U.S.C. § 1604, and we need not consider the alternative bases for dismissal relied on by the District Court or presented by defendants. We therefore AFFIRM the judgment of the District Court dismissing plaintiffs' action for want of jurisdiction.

## BACKGROUND

We set out the facts as alleged in the Complaint, amplified by the limited jurisdictional materials submitted by the parties. *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).

Arch Trading Corp., Arvin Properties Inc., Hezer Holdings Inc., Madec Limited, and Osis International Corp. (together, "plaintiffs") are entities "formed under the laws of the British Virgin Islands, i.e., outside of Ecuador," and are "separate and distinct juridical entit[ies]." J.A. at 15, Compl. ¶¶ 14, 15. Plaintiffs assert that since he assumed power in 2007, Ecuadorean President Rafael Correa Delgado has "aggressively advanced an agenda of debilitating competing interests and of concentrating power in himself and his allies," and that they have been victims of that agenda. J.A. at 20, Compl. ¶ 41. Beginning in July 2008, Ecuador's Agencia de Garantía de Depósitos ("AGD")—at the time "Ecuador's equivalent to the Federal Deposit Insurance Corporation," J.A. at 17, Compl. ¶ 28—unlawfully seized 133 companies owned by plaintiffs (the "Seized Companies") and failed to provide any compensation to them for

4

the taking.[1]  No legal recourse was available in Ecuador, plaintiffs assert:  Soon after the seizure, Ecuador's Constituent Assembly issued its "Mandate 13," which barred Ecuador's judiciary—on penalty of criminal prosecution—from considering any such legal challenges.

The Seized Companies are now owned and controlled by defendants.  Most of the Seized Companies are currently held by the Trust, an instrumentality of Ecuador that CFN and AGD established in March 2009.  CFN, another instrumentality of Ecuador, is the Trust's sole trustee.

In June 2013, plaintiffs filed the Complaint in the United States District Court for the Southern District of New York against Ecuador, CFN, and the Trust, seeking compensation for the Seized Companies.  Defendants moved to dismiss on a number of grounds, including that the FSIA precluded the District Court's exercise of jurisdiction. With respect to whether the FSIA's "takings" exception permitted the court's exercise of jurisdiction over them, they argued that it did not.  First, asserting that the ultimate owners of the five plaintiff companies are Ecuadorean individuals, they urged that the expropriations did not violate international law because they fall within the act of state doctrine.  *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer, *J.*, concurring) (noting "consensus view that § 1605(a)(3)'s reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals").  Second, they contended that even if the takings violated international law, plaintiffs still failed to satisfy Section 1605(a)(3) because the Seized Companies are all "located in" Ecuador (precluding jurisdiction over Ecuador under the first prong of

---

[1] Although the Complaint alleges that "several hundred companies . . . are the subject matter of this lawsuit," J.A. at 15, Compl. ¶ 16, the list of seized assets that they attached to their Complaint in the District Court and refer us to on appeal contains only 133, J.A. at 37-41.

Section 1605(a)(3)),[2] and that plaintiffs do not allege—indeed, cannot plausibly allege—that CFN and the Trust engage in any commercial activity in the United States (precluding jurisdiction over CFN and the Trust under the second prong of Section 1605(a)(3)).

To substantiate their position, defendants submitted declarations from high-ranking Ecuadorean officials discussing the activities in the United States of CFN and the Trust, all pointing toward the conclusion that neither CFN nor the Trust is engaged in commercial activity in the United States. In rebuttal, plaintiffs submitted a declaration made by Francisco Rendón Pantaleón (the "Rendón Declaration"). Rendón declares that he has held important managerial positions at CFN and has served in other high-ranking positions in the Ecuadorean government, including as its Minister of Economy and Finance. He further outlines the commercial activities in the United States that plaintiffs see as relevant to the application of Section 1605(a)(3).

The District Court granted defendants' motion to dismiss. It reasoned that, although plaintiffs are incorporated in the British Virgin Islands, they should be treated as Ecuadorean because their ultimate individual owners—Roberto and William Isaías Dassum (the "Isaías brothers"), it found, *see infra* note 3—are of Ecuadorean nationality. Under the act of state doctrine, therefore, the alleged takings of the Seized Companies did not violate international law and Section 1605(a)(3) does not apply. The District Court also ruled that plaintiffs failed to demonstrate that either CFN or the Trust is itself engaged in a commercial activity in the United States. This failure independently

---

[2] Plaintiffs stated at oral argument in the District Court on defendants' motion to dismiss that the Seized Companies are "located in Ecuador." J.A. at 575. Whether they meant that the Seized Companies are all creatures of Ecuadorean law, that the Seized Companies have no assets located in the United States, or something else, is not apparent, but their "location" in Ecuador is undisputed.

precluded plaintiffs' reliance on Section 1605(a)(3).  *See Arch Trading Corp. v. Republic of Ecuador*, No. 13-CV-4445, 2015 WL 3443906 (S.D.N.Y. May 28, 2015).

In the latter regard, the District Court observed that "[p]laintiffs merely outline examples of commercial activities that CFN and [the Trust's] *subsidiaries* [or other distinct legal entities] allegedly engage in," as opposed to activities of CFN and the Trust themselves.  *Id.* at *4 (emphasis added).  Because "agencies and instrumentalities of foreign states are presumed to be separate" from other distinct legal entities, the District Court declined to impute the activities of those entities to CFN and the Trust absent a showing that CFN and the Trust "exercise day-to-day control" over them.  *Id.* After finding that venue in the Southern District of New York was improper under the FSIA and also denying plaintiffs' request for jurisdictional discovery, the District Court dismissed the case with prejudice. [3]

---

[3] As we have noted, for purposes of reviewing the instant motion to dismiss for want of jurisdiction, we accept the version of the facts laid out in the Complaint as amplified and modified by the declarations submitted by both plaintiffs and defendants.  To provide further context for the parties' arguments, however, we observe that defendants—citing court filings in a closely related Florida state court case filed by an agency of Ecuador in 2009 (the "Florida action")—paint a vastly different picture of the key events.  *See* Appellees' Br. at 6-7; J.A. at 47-57 (Compl., *Agencia de Garantía de Depósitos v. Dassum*, No. 09-34950CA09 (Fla. 11th Jud. Cir. Ct.) (filed Apr. 29, 2009)).  In brief, although defendants agree with plaintiffs that in 2008 an agency of Ecuador, AGD, seized assets belonging to private entities, in their telling these assets belonged to the Isaías brothers.  The Isaías brothers (they charge) once controlled Filanbanco, formerly the largest Ecuadorean Bank.  When Filanbanco became insolvent in or about 1998, Ecuadorean financial agencies allegedly pumped hundreds of millions of dollars into Filanbanco in a vain attempt to save it.  The Isaías brothers assertedly used this cash infusion to enrich themselves personally.  Filanbanco ultimately collapsed and entered liquidation proceedings.  AGD then (in 2008) seized Ecuadorean assets owned by the Isaías brothers (the Seized Companies) to cover some of AGD's related losses.

Soon after, in 2009, AGD sued the Isaías brothers in Florida state court seeking compensation for losses arising from Filanbanco's failure.  Sixteen companies, including all five plaintiffs here, sought to intervene in that action and moved for leave to file a cross-complaint seeking damages for Ecuador's takings.  In their motion, the putative intervenors asserted at several points that they were wholly owned by members of the Isaías family.  J.A. at 244, 245,

7

This appeal followed.

## DISCUSSION

On appeal of a dismissal for lack of subject matter jurisdiction under the FSIA, "[w]e review the district court's legal conclusions concerning sovereign immunity *de novo* and its factual findings for clear error." *Kensington*, 505 F.3d at 153. To invoke the protections of the FSIA, the defendant must first present a prima facie case that it is a foreign sovereign or related instrumentality. *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). Once a defendant has presented such a prima facie case, then a court must determine whether an FSIA-recognized exception to immunity applies. In making this determination, "the district court can and should consider matters outside the pleadings relevant to the issue of jurisdiction." *Kensington*, 505 F.3d at 153. If, as occurred here, a sovereign defendant "challenges the factual basis of the plaintiff's claim [that the sovereign defendants are not immune], the plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (footnote and internal quotation marks omitted). When the plaintiff carries that burden of production, a district court must resolve disputed issues of fact, if there are any, when deciding the motion to dismiss. *Id.* Although the foreign sovereign shoulders the burden of persuasion on the ultimate question of subject matter

250. The Florida trial court permitted the companies to intervene, and Ecuador—which by then had been substituted as a plaintiff for AGD—moved successfully to dismiss the intervenors' complaint. Appellees advise that as of September 2015, the Florida action was still pending against Roberto and William Isaías individually.

The Florida action thus provided the basis for additional arguments made in the District Court and on this appeal. We express no view on their merits or on the merits of the District Court's alternative holding that a court may disregard a corporation's nation of incorporation and instead look to the nationality of its individual owners when determining whether a violation of international law has taken place. We also express no view of the District Court's factual finding that members of the Isaías family own or control plaintiffs.

jurisdiction, *id.*, those suing the sovereign shoulder the burden of rebutting the *Bancec* presumption of legal separateness when that presumption is at issue, *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d Cir. 2000).

## I.  Applicable law

### A.  Foreign Sovereign Immunities Act

The Supreme Court has described the Foreign Sovereign Immunities Act as "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, "a foreign sovereign and its instrumentalities are immune from suit in the United States courts unless a specific statutorily defined exception applies." *Zappia*, 215 F.3d at 251.  Absent such an exception, the immunity conferred by the FSIA strips courts of both subject matter and personal jurisdiction over the foreign state.  *Cargill*, 991 F.2d at 1016; *see* Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330; 1332(a)(2)-1332(a)(4); 1391(f); 1441(d); and 1602-1611).

Plaintiffs do not dispute that Ecuador is a foreign state presumptively entitled to sovereign immunity or that, because CFN and the Trust are Ecuador's instrumentalities under the FSIA, they too are presumptively shielded from suit.  The parties further appear to agree that the only exception to immunity under the FSIA under which jurisdiction could lie in this case is the "takings" or "expropriation" exception established in 28 U.S.C. § 1605(a)(3).

As previously discussed, Section 1605(a)(3) contains two independent prongs, each of which is subject to the precondition that the dispute concern property "taken in violation of international law[.]" *Id.*  Once the precondition is met, the first prong then provides that a foreign state is not immune from jurisdiction in any case in which "[a] property or any property exchanged for such property is [b] present in the United States [c] *in connection with a commercial activity carried on in the United States by the foreign*

9

*state*[.]" *Id.* (emphasis added). Plaintiffs did not allege in the District Court proceedings either that any of their expropriated property is present in the United States, *see supra* note 2, or that this prong of Section 1605(a)(3) applies against Ecuador itself. They do not argue otherwise here. Accordingly, we consider only whether plaintiffs' allegations support application of the second prong of Section 1605(a)(3) against CFN and the Trust.

Section 1605(a)(3)'s second prong withdraws immunity when "rights in property taken in violation of international law are in issue" and where (a) either the taken property or "any property exchanged for such property" is (b) "owned or operated by an agency or instrumentality of the foreign state" and (c) "that agency or instrumentality is engaged in a commercial activity in the United States[.]" *Id.* The second prong thus requires that the foreign sovereign's agency or instrumentality be "engaged in a commercial activity in the United States." Section 1603 of Title 28 defines both "commercial activity" and "commercial activity carried on in the United States by a foreign state," but not the phrase "engaged in a commercial activity in the United States." Section 1603(d) provides that a "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). It directs that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* In contrast, subsection (e) provides that "[a] commercial activity carried on in the United States by a foreign state" means "commercial activity carried on by such state and *having substantial contact* with the United States." *Id.* § 1603(e) (emphasis supplied). For present purposes, we assume without deciding that satisfying the less demanding definition of "commercial activity" stated in subsection (d) suffices to establish that an instrumentality is "engaged in a commercial activity in the United States" within the meaning of Section 1605(a)(3). *See*

10

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 946-48 (D.C. Cir. 2008) (applying Section 1603(d) to second prong of the takings exception).

### B.      The *Bancec* presumption

In *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), the Supreme Court established the principle that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27.  Sound justifications support this principle, known as the "*Bancec* presumption":  As the Court observed, "Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty" for sovereigns and creditors alike.  *Id.* at 626.  Further, recognizing the legal distinctions between entities drawn by another nation's laws accords "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations."  *Id.*

Accordingly, we have described the *Bancec* presumption as "strong."  *Zappia*, 215 F.3d at 252.  And, as we have recently observed, "both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness."  *EM*, 800 F.3d at 90 (internal quotation marks omitted).  In line with this approach, we will find the *Bancec* presumption to have been overcome only if "(1) the [entity] is so extensively controlled by its owner that a relationship of principal and agent is created, or (2) the recognition of an [entity's] separate legal status would work a fraud or injustice." *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 128 (2d Cir. 2016) (internal quotation marks omitted).

### II.      Commercial activity in the United States of CFN and the Trust

Defendants concede that, together, CFN and the Trust own or operate at least 80 of the 133 companies allegedly expropriated from plaintiffs.  Rather, they argue that CFN and the Trust are not themselves engaged in commercial activity in the United

States, and that the *Bancec* presumption means that we may not impute the commercial activities described in the Rendón Declaration to them.

For their part, plaintiffs question whether the *Bancec* presumption has any bearing here at all, observing that in *Bancec* the Supreme Court examined the relationship between a foreign state and an instrumentality of that state, both of which are presumptively entitled to sovereign immunity, whereas this case concerns the relationships between a foreign state's instrumentalities and other distinct legal entities that may not themselves be entitled to sovereign immunity.  We fail to see why the distinction is relevant, however:  Freely ignoring the separate legal status of foreign government instrumentalities vis-à-vis distinct non-governmental legal entities would create uncertainties closely resembling, if not identical to, those that the Court cited as necessitating the *Bancec* presumption in the first place.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475-76 (2003) (rejecting argument that "as a categorical matter, all subsidiaries are deemed to be the same as the parent corporation" because "[t]he text of the FSIA gives no indication that Congress intended us to depart from the general rules regarding corporate formalities"); *Bancec*, 462 U.S. at 628 (justifying *Bancec* presumption with legislative history warning that foreign jurisdictions might "disregard the juridical divisions between different U.S. corporations" "[i]f U.S. law did not respect the separate juridical identities" drawn by foreign law); *Zappia*, 215 F.3d at 251-52 (applying *Bancec* presumption to evaluate relationship between a bank and the Emirate of Abu Dhabi).

The *Bancec* presumption may be overcome in these circumstances, too, then, only if an entity is "so extensively controlled" that a relationship of principal and agent is created, or where respecting separateness "would work fraud or injustice." *Kirschenbaum*, 830 F.3d at 128.  The latter concern is not raised in this case.  Plaintiffs make no allegation, for example, that defendants manipulated the corporate form of the relevant governmental instrumentalities and their affiliates with the intention of

12

making it more difficult for plaintiffs to obtain compensation alleged to be due for their loss of property. *See EM*, 800 F.3d at 95-96. As to the former, we have recently clarified that the "touchstone inquiry" for the "extensive control" required by *Bancec* is "whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Id.* at 91. Pertinent factors include whether the sovereign entity:

> (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.

*Id*. Mindful of these factors, we next consider whether we may attribute to CFN and the Trust any of the commercial activities in the United States that plaintiffs have identified. We address each sovereign defendant in turn.

### A.    CFN

In support of their position, defendants submitted a sworn declaration by Danilo Morales, an employee of CFN for over sixteen years and CFN's "Attorney of the General Manager" as of 2014, when the declaration was made. Morales avers that "CFN has no contracts with U.S. companies or that require performance in the United States; it is not licensed to do business in the United States and it does not conduct business there; [and] it has no investments or other property" there. J.A. at 404, ¶ 5.

The Rendón Declaration is designed to rebut these assertions. Rendón avers generally that "CFN, since its very inception, actively and affirmatively has engaged in business activities in the United States. A number of the entities [th]at CFN has confiscated have a commercial presence in the United States and most [of] these

13

companies have never ceased to conduct business in the United States." J.A. at 417, ¶ 19. He offers five "emblematic" examples. J.A. at 418, ¶ 20. These concern Pacific National Bank; Seguros Sucre, S.A.; Rocafuerte Seguros, S.A.; TC TV and Gama TV; and Banco del Migrante. In presenting four of these, however, Rendón follows a similar pattern: He describes the activities in the United States of entities *other than* CFN, and then offers only conclusory averments that CFN exercises some kind of control over those entities.[4]

For example, Rendón states that CFN is the sole shareholder of Banco del Pacífico S.A. Ecuador ("Banco Pacífico"), which in turn is the sole shareholder of Pacific National Bank, located in Florida. Banco Pacífico has invested over $100 million in Pacific National Bank, a United States entity, he asserts. But because CFN, Banco Pacífico, and Pacific National Bank are distinct legal entities, it does not follow that "CFN . . . is responsible for USD $100 million of commercial activity in the United States," as Rendón declares. J.A. at 419, ¶ 26. Rendón also avers that CFN employees are members of Banco Pacífico's board of directors, and that CFN is "quite active" in naming Banco Pacífico's senior management. J.A. at 419, ¶ 27. But Banco Pacífico is an entity distinct from Pacific National Bank, and, even as to CFN's relationship with Banco Pacífico, "courts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption," *EM*, 800 F.3d at 92 (footnote omitted), because the exercise of such powers is "not synonymous with control over the instrumentality's day-to-day operations," *id.* at 93. Especially in light of his asserted access to Banco Pacífico's

---

[4] Rendón elsewhere appears to acknowledge the attenuated nature of the relationships. *See* J.A. at 425, ¶ 47 (averring that CFN "engages in . . . commercial activity" "*through*" the entities discussed in his declaration (emphasis added)).

operations,[5] his failure to cite any specific examples of CFN's influence over either Banco Pacífico or Pacific National Bank undermines his claims. Rendón's averments of CFN's involvement thus fall well short of establishing the existence of any "significant and repeated control" by CFN over Banco Pacífico's (or Pacific National Bank's) operations.

Rendón also identifies two Ecuadorean insurance companies, Seguros Sucre, S.A., and Rocafuerte Seguros, S.A., that allegedly conduct business in the United States. Rendón's averments of CFN's involvement in the operations of those companies are far too threadbare, however, to rebut the *Bancec* presumption with respect to these companies. Both are legal entities distinct from CFN: The record reflects that CFN owns all of Seguros Sucre's shares, and the Trust holds all the shares of Rocafuerte Seguros. Rendón avers generally that CFN "actively oversees Seguros Sucre's operations (management) and commercial dealings," but provides no details in support of that claim. J.A. at 420, ¶ 32. And Rendón makes no assertions of any CFN involvement in Rocafuerte Seguros's operations whatsoever. The District Court reasonably refused to accept these conclusory allegations as a sufficient basis for inferring the necessary level of control. *See Zappia*, 215 F.3d at 253 (rejecting challenge to the *Bancec* presumption because "[t]he conclusory allegations in Mr. Zappia's affidavit are not sufficient to create a material issue of fact").

Rendón's allegations about the relationship between CFN and TC TV and Gama TV, two television stations whose shares appear to be held by the Trust,[6] and which

---

[5] Beginning January 2011, for example, Rendón served as "Manager of Deposit Accounts," a position he held until he became the "National Manager of Institutional Relationship" the following January. He further avers that he is a former member of Banco Pacífico's board of directors.

[6] The Rendón Declaration is imprecise on this point: It states that the Trust is the "single shareholder" of Rocafuerte Seguros, J.A. at 421, ¶ 33, and that TC TV and Gama TV "belong to"

purchase programs from United States entities such as Disney, Warner Brothers, and others, are no different. Rendón alleges generally that CFN "oversees" the commercial transactions of TC and Gama, and "affirmatively participates in negotiations with U.S. entities." J.A. at 423, ¶ 39. But this nonspecific "oversight" of and "participation" in contractual negotiations, standing alone, is not enough to permit us to conclude that TC and Gama are mere shells for corporate activity more appropriately attributable to CFN. *See DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 216-17 (D.D.C. 2014) (contract between company and sovereign's instrumentality requiring sovereign to "monitor[] [its instrumentality's] overall compliance" with contract did not demonstrate "the sort of managerial control needed to overcome [the instrumentality's] presumptive separateness" (internal quotation marks and alterations omitted)); *GSS Grp. Ltd. v. Republic of Liberia*, 31 F. Supp. 3d 50, 66 (D.D.C. 2014) ("GSS fails to offer any persuasive argument as to how the government's co-signing the contract and its being kept apprised of 'notices in respect of [its instrumentality]' demonstrate the sort of extensive control necessary to disregard the [instrumentality's] distinct corporate identity."), *aff'd sub nom. GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598 (D.C. Cir. 2016). Rendón does not declare nor do plaintiffs allege that, for example, TC and Gama lacked the capacity to decline CFN's involvement. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-CV-6124, 1999 WL 307666, at *10 (S.D.N.Y. May 17, 1999) (finding *Bancec* presumption rebutted where sovereign instrumentality "deposited funds in [its indirect subsidiary's] bank account . . . and made millions of dollars of . . . payments from that account . . . without seeking approval from [the indirect subsidiary]," and fully negotiated a $163 million contract "and simply 'nominated [the indirect subsidiary]' to serve as the signatory to various transactions related to [the contract]"), *conclusions aff'd,*

_____

the Trust, J.A. at 423, ¶ 39. Lacking any indication otherwise, we interpret these statements to mean that the shares of each of these companies are held in trust by the Trust for its beneficiary.

16

199 F.3d 94, 98 (2d Cir. 1999). Nor do they allege that the benefits of these agreements inured solely to CFN. *See Seijas v. Republic of Argentina*, 502 F. App'x 19, 23 (2d Cir. 2012) (citing as illustrative example of extensive control the fact that instrumentality "never exercised its right to collect a percentage on transactions relating to [the sovereign's] oil, but passed on all proceeds to the state"). And plaintiffs do not allege or demonstrate that CFN is involved in TC and Gama's affairs outside of contractual negotiations—e.g., they make no allegations that CFN used TC and Gama's resources as its own or disregarded corporate formalities between them. *See EM*, 800 F.3d at 91.

Taking a different but equally unsuccessful tack, plaintiffs cite to CFN's Ecuadorean foundational statute to lend support to their argument. For example, they note that CFN is authorized to have overseas offices, but they never claim that CFN actually maintains an outpost in the United States. The enabling statute also requires CFN to "administer" the Trust's assets, plaintiffs observe, *e.g.*, Sp. App'x at 75, but this authorization does not demonstrate that CFN in practice exercises the significant, day-to-day control over any United States-based or -involved entities that is required to rebut the *Bancec* presumption.

Finally, Rendón asserts that a United States commercial activity can be found in the fact that CFN, acting on its own behalf, helped establish "Banco del Migrante," a program allegedly launched to "make available CFN's financial products to Ecuadoreans living in the United States" and which other Ecuadorean entities have ostensibly advertised in the United States. J.A. at 424, ¶¶ 42, 44. If true, perhaps CFN might be said itself to engage in commercial activity in the United States instead of through some other entity, and the requirements of U.S.-based commercial activity in the takings exception could be satisfied.

But Danilo Morales avers that, although some initial paperwork for such a program was completed, the program never came to fruition. He agrees that CFN

17

provides loans to expatriate Ecuadoreans, but he clarifies that CFN does so only upon the citizens' return to Ecuador. And the record evidence supports his characterization, at the expense of Rendón's. Indeed, plaintiffs themselves submitted a number of newspaper articles and other printouts of online material that seem to undermine their position. For instance, promotional materials for the program that are included in the record describe a "[d]oor for [r]eturning [m]igrants," J.A. at 466, and a "[w]elcome [h]ome [p]rogram," J.A. at 468, designed for "covering the needs of persons who return to the country," J.A. at 480. A news article describes a "Migrant Bank Trust Fund . . . directed towards helping migrant persons who have returned to Ecuador," and advises that "[a]ll of the [beneficiaries] returned to the country after several years abroad." J.A. at 478. Thus, the District Court did not clearly err by rejecting plaintiffs' assertions about the relationship between CFN, Banco del Migrante, and the United States.

## B.     The Trust and Ecuador

On behalf of defendants, Ronald Pérez, CFN's Deputy National Manager of Fiduciary Trust and Securitization, submitted a sworn declaration in which he avers that, like CFN, the Trust has no contracts with United States companies or contracts that require performance in the United States; is not licensed to do business in the United States; and has no investments, bank accounts, or other property in the United States.

The Rendón Declaration does not include a separate discussion of the Trust. Instead, piggybacking on their arguments as to CFN, plaintiffs appear to urge that the Trust is engaged in commercial activity in the United States because the Trust holds stock in and—through its trustee, CFN—"controls the management and operation" of companies engaged in such activity. Appellants' Br. at 54. Plaintiffs identify only three such entities: TC TV, Gama TV, and Rocafuerte Seguros, S.A. Accepting *arguendo* plaintiffs' argument that the Trust's legal status (as distinct from that of the entities whose stock it holds) rises or falls with CFN's parallel status as Trustee, they have not

18

rebutted the *Bancec* presumption for the same reasons that they have not rebutted it as between CFN and those entities, as discussed above.

Finally, neither plaintiffs in their brief nor the Rendón Declaration addresses the commercial activity of Ecuador itself in the United States or Ecuador's relationship with any of the legally separate entities mentioned above. One might argue that, were we to conclude that the District Court may exercise jurisdiction over CFN or the Trust consistent with Section 1605(a)(3), then it follows that the court may exercise jurisdiction over Ecuador as well. Some of our sister Circuits appear to hold this general view about the relationship between an instrumentality's sovereign immunity and that of its associated sovereign, while some district courts in our Circuit have questioned the reasoning. *Compare, e.g.*, *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1022, 1028-34 (9th Cir. 2010) (*en banc*) (concluding, without engaging in independent analysis of jurisdiction over Spain, that district court could exercise jurisdiction over Spain and its instrumentality because the instrumentality owned the expropriated property and was engaged in a commercial activity in the United States); *Agudas Chasidei Chabad*, 528 F.3d at 948 (concluding, without separate discussion of jurisdiction over Russia, that district court had jurisdiction over Russia because two of its instrumentalities held expropriated property and were engaged in a commercial activity in the United States), *with, e.g.*, *Hammerstein v. Fed. Republic of Germany*, No. 09-CV-443, 2011 WL 9975796, at *5 (E.D.N.Y. Aug. 1, 2011) (concluding that "the takings exception does not provide jurisdiction" over a foreign sovereign when "the property at issue is not in the United States"); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 561 (S.D.N.Y. 2008) (articulating, but declining to resolve, the same argument), *aff'd sub nom. Freund v. Société Nationale des Chemins de Fer Français*, 391 F. App'x 939 (2d Cir. 2010). The FSIA's definition of "foreign state" may also contribute to the confusion by "includ[ing] . . . an agency or instrumentality of a foreign state" within its purview. 28 U.S.C. § 1603(a). We

19

do not reach the issue, however, for even assuming that this interpretation of Section 1605(a)(3) is correct, the District Court lacked jurisdiction over CFN and the Trust for the reasons discussed above.

## III.    Denials of jurisdictional discovery and of an evidentiary hearing

In a final effort to preserve their suit, plaintiffs contend that at the very least the District Court acted too hastily in dismissing the Complaint without either conducting an evidentiary hearing or affording them the opportunity to pursue jurisdictional discovery.  Discovery, they say, would allow them to reinforce their argument that defendants conduct United States-based activities sufficient to support the exercise of jurisdiction over them by United States courts, and an evidentiary hearing would permit resolution of disputed issues of relevant fact.  We are not persuaded on either count.

We review a district court's denial of jurisdictional discovery for abuse of discretion, *see Swarna v. Al-Awadi*, 622 F.3d 123, 143-44 (2d Cir. 2010), always mindful that a district court has "wide latitude to determine the scope" of discovery, *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009).  A district court's decision not to hold an evidentiary hearing is similarly reviewed for abuse of discretion.  *See Zappia*, 215 F.3d at 253.

Because "sovereign immunity protects a sovereign from the expense, intrusiveness, and hassle of litigation, a court must be 'circumspect' in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA."  *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 210 (2d Cir. 2012) (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998)), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014).  Accordingly, a district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a

20

"reasonable basis" for the court first to assume jurisdiction. *See Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990); *cf. Jazini v. Nissan Motor Co.*, 148 F.3d 181, 183, 185 (2d Cir. 1998) (affirming dismissal for lack of jurisdiction "before discovery" because plaintiffs' allegations "lack[ed] the factual specificity" to show that subsidiary was a "mere department" of foreign corporate parent).

The District Court acted within the permissible bounds of its discretion when it concluded that plaintiffs did not present an adequate basis for expecting that they would be able to rebut the *Bancec* presumption with respect to CFN, the Trust, or Ecuador. With respect to CFN, plaintiffs' averments of sovereign control are largely conclusory and were rightly disregarded. The remaining relevant averments, including those concerning CFN's power to appoint board members or managerial employees of some of its subsidiaries, establish only that CFN exercises powers incidental to ownership of these separate entities—not that CFN ignores corporate formalities or directs the entities' day-to-day operations. The *Bancec* presumption is difficult to overcome, and plaintiffs do not come close to the mark. *See, e.g., McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351-52 (D.C. Cir. 1995) (finding *Bancec* presumption rebutted where "[r]outine business decisions, such as declaring and paying dividends to shareholders and honoring [the instrumentality's] contractual commitments, were dictated by [the sovereign state]"); *Kensington Int'l Ltd. v. Republic of Congo*, No. 03-CV-4578, 2007 WL 1032269, at *9-12 (S.D.N.Y. Mar. 30, 2007) (finding *Bancec* presumption rebutted where: (1) auditors were required to obtain "an official letter from the [sovereign's] Ministry of Finance" to receive access to the instrumentality's financial records; (2) audits revealed "the absence of any clear demarcation between [the sovereign's] finances and those of [the instrumentality]"; (3) the instrumentality's corporate structure was designed to allow the sovereign to engage in "unnecessarily complex transactions and charades for the purpose of confounding its creditors"; and

21

(4) the instrumentality's business records suggested no commercial activity distinct from that performed on behalf of the sovereign).  With respect to Ecuador and the Trust, they make no attempt to show that either is engaged in a commercial activity in the United States independent of CFN's alleged commercial activities in the United States.  Plaintiffs thus effectively group together CFN, Ecuador, and the Trust, in conflict with the policies underlying the *Bancec* presumption.

Further, plaintiffs did not specify—and on appeal still have not specified—what discovery they might seek.  When sovereign immunity is at issue, discovery is warranted "only to verify allegations of specific facts crucial to an immunity determination."  *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) (internal quotation marks omitted).  The conclusory nature of the averments contained in the Rendón Declaration suggests that plaintiffs do not yet know what they expect to find from discovery notwithstanding that their declarant, Rendón, held a managerial position at CFN when they prepared and filed the Complaint.  The FSIA protects defendants from a fishing expedition that seeks to examine the details of the relationships between them and a number of distinct legal entities without any non-speculative basis for believing that those details would establish jurisdiction.

Plaintiffs maintain that discovery should nonetheless have been allowed because, they claim, the *Bancec* presumption issue was "neither briefed nor argued below" and "[t]he district court did not ask any questions at oral argument concerning *Bancec*."  Appellants' Reply at 27.  But, by our reading, plaintiffs stray from the record in making this claim:  Defendants raised the *Bancec* issue in their motion to dismiss and again in their reply.  And the District Court discussed the relevant aspects of the Rendón Declaration extensively at oral argument.  Although the District Court may not have mentioned the case name "*Bancec*," it certainly highlighted the distinction between activities of defendants and of the entities alleged to be conducting commercial activity

22

in the United States.  The District Court itself initially prompted counsel for plaintiffs by stating that it "underst[ood] the point about the subsidiaries maybe doing business" in the United States, and asking, "[W]hat business are [CFN, the Trust, and Ecuador] doing *themselves*?"  J.A. at 577 (emphasis added).

Nor did the District Court abuse its discretion by not conducting an evidentiary hearing.  *See APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("Where jurisdictional facts are placed in dispute, . . . [a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." (internal quotation marks and alterations omitted)).  Plaintiffs did not request such a hearing, and the District Court was not required to convene one *sua sponte*.  *See, e.g.*, *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1120 (1st Cir. 1989) (noting courts of appeals "regularly turn a deaf ear to protests that an evidentiary hearing should have been convened but was not, where, as here, the protester did not seasonably request such a hearing in the lower court").  And even were we to overlook this gap, the Rendón Declaration's few non-conclusory averments, were they to be credited, hardly establish an entitlement to a hearing.  Although the submitted declarations conflict with respect to the existence and nature of a Banco del Migrante program, plaintiffs' position is undermined by their own submissions.  In these circumstances, plaintiffs have no entitlement either to a hearing or to the discovery they now demand.

## CONCLUSION

In summary, we agree with the District Court that it lacks subject matter jurisdiction because plaintiffs have failed to establish the applicability of the takings exception to foreign sovereign immunity.  Plaintiffs fail to provide an adequate basis for inferring that CFN or the Trust is engaged in commercial activity in the United States within the meaning of Section 1605(a)(3).  Although plaintiffs point to the commercial activities in the United States of certain entities alleged to be owned by CFN or held in

23

the Trust, they fail to clear the high bar imposed by the *Bancec* presumption and ensuing case law for imputing those activities to the defendant instrumentalities.  The District Court committed no error in so holding, nor in denying plaintiffs an evidentiary hearing and jurisdictional discovery.

Accordingly, we AFFIRM the judgment of the District Court dismissing the suit with prejudice for want of jurisdiction.